### SELLARS v. HARVEY.
No. A–4133.

District Court of Alaska. Third Division. Anchorage.
June 13, 1946.

J. L. McCarrey, Jr., of Anchorage, for plaintiff.
John E. Manders, of Anchorage, for defendant.

DIMOND, District Judge.

The action is brought under the forcible entry and detainer statute to recover possession of building space used

for a retail shop. The plaintiff is the owner of the building, known as the Hawver Apartments situated in the City of Anchorage, and of the land on which the building is situated. The upper stories of the building are occupied by apartments. A part of the ground floor is divided up into shops. The plaintiff purchased the property on August 27, 1945, from the then owners, Oren A. Diamond and Esther G. Diamond.

On April 29, 1945, and prior to the date of plaintiff's purchase, the then owners granted to the defendant, Clara Harvey, a lease of the premises in dispute. The lease was dated and executed on April 24, 1945, but by its terms was retroactive to February 1, 1945. The following is quoted from the lease:

"To have and to hold the said premises, with appurtenances, for the term of one (1) year; namely, from the first day of February, 1945, to and including the 31st day of January, 1946, at and for the following rentals: The sum of Five Hundred Dollars ($500.00) payable at the date of execution of this lease by the Lessee to the Lessors, the receipt of which is hereby acknowledged by the Lessors; the sum of Three Hundred Dollars ($300.00) payable the 1st day of June, 1945; the sum of Three Hundred Dollars ($300.00) payable the 1st day of July, 1945; the sum of $273.33 payable the 1st day of August, 1945; the sum of $200.00 payable the 1st day of September, 1945; the sum of $200.00 payable the 1st day of October, 1945; the sum of $200.00 payable the 1st day of November, 1945; and the sum of $200.00 payable the 1st day of December, 1945."

It will thus be seen that the lease extended "for the term of one (1) year," and that the rent was payable in the installments provided for in the lease. Testimony given at the trial indicated that between February 1 and April 24, 1945, or some portion of that period, a part of the space covered by the lease was occupied by other parties and that an adjustment was made of the rent to be paid by the lessee on that account.

This suit arises out of another paragraph of the lease which reads as follows:

"The Lessors hereby grant to the lessee, and the lessee is hereby given, an option for an additional period of one year at the end of the herein demised term, upon the same terms and conditions; ·provided, however, that written notice of Notice of Intention to exercise said option shall be given to the Lessors at Anchorage, Alaska, by the lessee no later than the 1st day of January, 1946, provided that such rental shall be $200.00 per month."

The lessee, the defendant in this action, paid the rentals provided for in the lease fully and on time. The last four installments, namely, those payable on the first days of September, October, November and December, respectively, in the amount of $200 each, were paid to the plaintiff Sellars, who had then become the owner, and accepted by him. These amounts, together with those theretofore paid to the former owners, Oren A. and Esther G. Diamond, covered the rentals in full for the period of the lease, which expired on and with January 31, 1946, unless the term of the lease was extended, or renewed, for the additional period of one year under the provisions of the lease above quoted.

The contest in this case arises over the question whether the term of the lease was so extended or renewed for the additional period of one year from and after January 31, 1945, the plaintiff denying any such extension or renewal and the defendant affirming it. It will be noted that the provision concerning the additional period of one year for the term of the lease requires "that written notice of * * * intention to exercise said option shall be given to the Lessors at Anchorage, Alaska by the lessee no later than the first day of January, 1946, provided that such rental shall be $200.00 per month."

So we see that written notice was required as a condition precedent for the extension of the term of the lease for one additional year. It seems well established, however, that such written notice may be waived by the lessor,

that the waiver need not be in writing, and that waiver by parole does not violate the statute of frauds. Khourie Bros. v. Jonakin, 1927, 222 Ky. 277, 300 S.W. 612.

On the issue as to whether or not the notice was given, the plaintiff gave the testimony that is hereinafter set out concerning conversations which he had with the husband of the defendant on December 28 or December 29, 1945, at the plaintiff's residence at Anchorage. This testimony was not contradicted or disputed in any manner at the trial. It appears that the defendant's husband was in the City of Anchorage during the trial and, therefore, was available as a witness. Nor was the authority of the defendant's husband to represent the defendant as her agent in the matter of extension of the lease ever questioned by the defendant herself, although she testified at the trial of the action. Excerpts from the testimony of the plaintiff follow:

"It was on the 28th or 29th, I am not certain just exactly which day it was * * * I had two conversations with Mr. Harvey: in the morning, approximately 9 or 10 o'clock in the morning, and another conversation with him later that day, around 7 o'clock in the evening. * * *

"Mr. Harvey came to the door and was—when I got to the door—I think I was called by my employee over there. * * * And Mr. Harvey told me that he and his wife were going Outside on a trip—they were leaving the following morning the first thing, and he wanted to get the rent paid before he left. We passed the time of day, and some conversation was had regarding the purpose of his trip—his and his wife's trip Outside—and I asked him at the time who had the keys to the shop and apartment; because it might be necessary in case of an emergency to get into the shop, I would like to know who had possession of those. And he advised me that his niece or cousin—some relative from the States who was there—was going to look after things and that if anything came up I could get in touch with her about it.

"We also had a conversation—Mr. Harvey said that he wanted to talk to me later about their lease on the dress shop and said they had in mind a lease for two or three additional years with an option to renew for one or two years, and he wanted to ascertain what my attitude was. I told him that his wife had been a very satisfactory tenant, that it was a good type of business to have there, etc., but that I had— that when I released those premises I would like to put the leases on at least a five-year basis, because I planned on doing that with all of the space on the ground floor. And at that time Mr. Harvey remarked to me that they didn't want to stay in there just one more year, because of the impending construction of this Northern Commercial building adjacent to my building. Because of the—he remarked at the time that they would undoubtedly block the sidewalk off when they put their equipment in there and there would be noise and dirt and dust, etc., and partially on account of that reason, they wanted to get an extension of their lease— they didn't figure that one year would be any good to them. I told them I would think it over. He said that in the meantime, he would have some papers drawn up and come back and talk with me later about it; that he was in a hurry—he had to do some packing, etc. I didn't see him again until that night. * * *

" * * * he came to my apartment about—I don't recall the hour, it must have been about 7 o'clock. It was quite dark and, as I recall, it was just before my dinner hour. At this time, he was admitted to the apartment and came on in and sat down in one of the chairs and I sat on the lounge and talked * * * and after exchanging some pleasantries we started talking about the future of the town, particularly with reference to the West end of the town there, from a merchandising point of view. I told him that I thought the town was certainly good for five years, particularly that end of the town, and he said he thought two or three years but he wouldn't want to gamble any on five years. But he said I might be right, and he pulled a couple of pieces of paper

out of his pocket and told me that this was what he had prepared for me to sign and he wanted me to read it over and consider it, and if I was agreeable to it, to sign it and give him a copy of it—or the original and I was to keep one copy of it.  *  *  *

"I also—at the time that he gave me this paper, I noticed there was a blank in the number of years that was to be specified, and I was—I told him that I thought that I should keep my leases on a five-year basis if I could and with an option for an additional year at the end of the five-year' term.  I told him, though, that I would think the matter over further.  He wanted me to sign the paper at that time and give it back to him, but I told him I would have to consult with my attorney and see what he thought of the advisibility of signing it.  I said if he advises me to I will, but I couldn't give him any assurance about that.  And I think that's the paper there."

(Paper was identified, admitted in evidence as Plaintiff's Exhibit No. 5, and read by the witness.)

" *  *  *  he wanted me to sign that and give it back to him before he left, but as I said before, I told him that before signing it I would like to consult with my attorney and discuss the matter with him.  I also told him that if I were advised to sign it—if my attorney was agreeable and so advised me—that I would have a lease prepared along whatever lines the attorney advised me; and told him that if he wished I would consult further in the matter with his attorney, and I asked him who his attorney was and he told me.  And I asked if he wanted me to see his attorney, and he said no, he preferred I didn't; and he would be back in about four weeks—he would be back before the first of February —and he would come and see me further and see what I had decided by then.  And with that, I wished him a pleasant trip and he left.  *  *  *  he said he would be back before the first of February—figured on being gone about four weeks."

In the testimony above quoted the plaintiff referred to a "paper" submitted to the plaintiff by Mr. Harvey during the conversation on the evening of December 28 or 29, 1945. That instrument, written on a letterhead of defendant, was identified by both plaintiff and defendant, and was admitted in evidence as Plaintiff's Exhibit No. 5 Copy of it follows:

"Dec. 28th 1945

"This is to certify that I will continue the lease under the same conditions, and provisions that Mrs. Clara Harvey now holds, on what is now known as the Caroll Shop, and that a privilege of an additional ———— yr can/may be had under the same conditions, if request is made in writing 60 days prior to this expiration

"Signed ————————
————————"

Plaintiff further testified that he had no subsequent conversation with either the defendant or her husband on the subject of occupation of the premises, or of any extension of the lease, until on or about March 1, 1946, when he served notice upon the defendant requiring her to quit and surrender the premises and deliver the same to him on or before April 1, 1946.

In all her testimony the defendant asserted, and insisted, that the instrument above quoted, dated December 28, 1945, and not signed by anyone, was, as to the first portion thereof, her written notice to the plaintiff of the exercise of her option to extend the lease for the further period of one year, and was so intended. The defendant says that notice is embraced in the following language:

"This is to certify that I will continue the lease under the same conditions, and provisions that Mrs. Clara Harvey now holds, on what is known as the Caroll Shop."

Whether or not the writing just quoted is such a notice as complies with the law and the relevant provisions of the lease, or is any notice at all, is the first question requiring decision.

Admitting that a notice, if sufficient in other respects, need not be signed by the lessee, (as indicated in the case of Wiener v. H. Graff & Co., 1908, 7 Cal.App. 580, 95 P. 167), is a lack of signature of the defendant to the instrument in ques-tion the only feautre of the so-called notice that is amiss? Is it not clear from the instrument itself that it was never intended to be a notice of intention to exercise the option for extension, and that it was rather, as testified by the plaintiff, an outline of an entirely new lease which the defendant desired the plaintiff to sign?

It seems doubtful, upon the face of the instrument, that the defendant actually wrote it, because she refers to her place of business as "The Caroll Shop," whereas in numerous checks made by her, which were introduced in evidence, she signs as follows: "Carol's Shop," with her own name written underneath. In each of these checks the word is written "Carol's" without exception, and we see nowhere the strange spelling which is used in the instrument of December 28.

But aside from any conclusions which may be drawn from the spelling or punctuation or physical appearance of the instrument in question, it is, at least, more than reasonably clear that the writing is not only not a notice, but was never intended as such. The writer says: "This is to certify that *I* will continue the lease under the same conditions, and provisions that *Mrs. Clara Harvey* now holds." (Emphasis supplied.) Why would Mrs. Harvey in the same clause of the sentence refer to herself at one time as "I," and a few words later as "Mrs. Clara Harvey." Is it not all too clear that the "I" was intended to refer to the lessor, the plaintiff in the action, and not to Mrs. Harvey, the defendant? This instrument on its face, fully sustains the conception placed upon it at the time it was presented to the plaintiff by both the plaintiff and by the defendant's husband, Mr. Harvey, namely, that it was an instrument to which the signature of the plaitniff was desired in order to grant an entirely new lease to the defendant for the premises occupied. Any oth-

er conception would be so tortuous and strained as to bar adoption by the Court.

Since the only written instrument in the case must necessarily be found not to be, and not intended to be, a written notice of exercise of the option to extend the term of the lease, the further question arises as to the relations of the parties. The plaintiff received and retained two checks written by the defendant in payment of rentals of the property of the premises in question, one dated January 1, 1945, (sic) paid at the bank January 3, 1946, in the sum of $200, and one February 1, 1946, for the sum of $200. For the first check the plaintiff gave the defendant a receipt for rental for Carol's Shop for the month of February, 1946. For the next check, dated February 1, 1946, in the sum of $200, the plaintiff gave a receipt "for rent of Carol's Dress Shop," without specifying the period covered. Another check for $200 was mailed to the plaintiff by defendant on or about March 1, but the plaintiff, being advised of the nature of the contents of the envelope containing the check, declined to take it from the post office, and it was returned to the defendant. A fourth check for $200 was delivered to the plaintiff by the defendant, either in person or by mail, and this check was still held by the plaintiff, uncashed, at the time of the trial, because the plaintiff, as he testified, was uncertain of the legal status of the matter. Beyond dispute, the defendant has not been and is not in default in any manner, or on any theory of the case, in attempted payment of rentals, although defendant has not accepted all checks offered as such payment.

The question remaining to be answered, is whether or not the plaintiff waived the giving of written notice of extension of lease provided for therein. That no express waiver was made, either orally or in writing, is not even suggested, but it is urged that the plaintiff accepted from the defendant rentals for the months of February and March, 1946, at the rate of $200 per month, that being the amount specified in the

provisions of the lease which gives to the defendant the option to extend the same for the period of one year.

■ Even more persuasive is the suggestion that the lease itself is on a yearly basis, despite the fact that all of the rent was to be payable in installments, and was so paid, and that when the defendant held over, with the consent of the plaintiff landlord, at the expiration of the yearly period, the extension by operation of law was made for the term of one year. While judicial opinion on this point is not in harmony, the prevailing rule is probably stated in the case of Marks v. Corliss' Estate, 1932, 256 Mich. 460, 240 N.W. 71, 72, from which the following is quoted:

"Where one has a lease for years, with annual rent reserved, and holds over after the expiration of the term with the acquiescence of the landlord, the tenancy is from year to year on the conditions of the lease, although the annual rent is payable in monthly installments. Laughran v. Smith, 75 N.Y. 205; Faraci v. Fassulo, 212 Mich. 216, 180 N.W. 497; but where the rent reserved is monthly, the holding over is from month to month unless the lease otherwise provides, Barlum v. Berger, 125 Mich. 504, 84 N.W. 1070."

■■ But in the present case, the holding over was not on any such yearly basis. The holding over was on the expressed and explicit oral understanding and agreement made by the defendant, through her agent, with the plaintiff that "they didn't want to stay in there just one more year" and "they didn't figure that one year would be any good to them." The defendant requested the plaintiff to grant a lease for a longer term than one year. The plaintiff promised only to consider the request and to consult his attorney. Under those circumstances it is obvious that there was then neither intention nor desire on the part of the defendant to hold the premises for only one year more. Hence, a rule of law which might automatically have extended the tenancy for one year by holding over does not apply. The defendant could have accomplished the same object by giving ex-

plicit written notice that she intended to hold for the additional year had she wished to hold for another year. Under the circumstances existing it is obvious that the defendant could not possibly be bound to the now claimed additional yearly tenancy and, therefore, the plaintiff is not bound. Both must be held or both absolved. The only agreement that the Court can find, or that can be reasonably implied, from the actions and words of the parties in this case, is that the holding over was to be what is known in law as a tenancy at will, with a month's notice to terminate required. That such is the nature of the tenancy where the tenant holds over, pending negotiations for a new lease, see 2 Tiffany on Landlord and Tenant, P. 1487; Thompson v. Baxter, 1909, 107 Minn. 122, 119 N.W. 797, 21 L.R.A.,N.S., 575, in which, perhaps as dicta, the Court points out the distinction that in such a tenancy at will the tenancy begins by permission of the landlord, while in the case of tenancy by sufferance the holding over by the tenant is unlawful. In the instant case the effect would be the same.

The plaintiff is entitled to recover the premises and to apply on account of the rentals accruing since January 31, 1946, under the tenancy at will created by the acts and words of the parties, the amounts heretofore paid by the defendant as such rentals, and to recover any additional sums due or to become due for the period that the defendant has been or may be in possession of the premises after January 31, 1946, at the rate of $200 per month.

Findings and decree may be prepared accordingly.